# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | |
|---|---|
| CATHLEEN M. WOLTERSDORF and KURT WOLTERSDORF,<br><br>Plaintiffs<br><br>v.<br><br>RUSSELL L. DESROCHERS and PHILLIPS EXPRESS, INC.,<br><br>Defendants | Civil No. 05-107-P-C |

Gene Carter, Senior District Judge

## MEMORANDUM OF DECISION AND ORDER

This case arises out of an automobile accident that occurred on June 2, 1999, in Sanford, Maine. Plaintiff Cathleen M. Woltersdorf claims to have suffered injuries to her left sternoclavicular joint and shoulder, which she attributes to the accident. Kurt Woltersdorf, Cathleen's husband, also brings a claim for loss of consortium.

## I. FACTS

After a three-day bench trial the Court finds the following facts. On June 2, 1999, Mrs. Woltersdorf was stopped at a traffic light in her Ford F-150 pick-up truck when Defendant Russell Desrochers stopped behind her in his tractor trailer. Joint Ex. 13 at 19, 22. For some unexplained reason, when the vehicles were stopped at the traffic light Mr. Desrochers' vehicle lurched forward, striking the rear of Mrs. Woltersdorf's vehicle. Trial Tr. of Cathleen Woltersdorf at 23. The impact caused her vehicle to be propelled

twenty feet into the intersection.  *Id.* at 24.  Indicative of the force of the impact, the glove box inside Mrs. Woltersdorf's vehicle popped open, the tape she was listening to ejected itself from the tape player, and numerous plants that were contained in the truck bed fell out onto the street.[1]  *Id.* at 24-26.  Within minutes after the accident, emergency medical personnel ("EMT") responded and checked Mrs. Woltersdorf for injuries.  Joint Ex. 2, tab A.  The contemporaneous note made by the EMT provides that Mrs. Woltersdorf's only complaint was that she was "shaken."  Mrs. Woltersdorf reported to the EMT's that she did not strike her head and that she did not have neck or back pain. *Id*.  Mrs. Woltersdorf refused to go to the hospital with the emergency medical personnel. *Id*.  The accident caused $715.83 in damage to the bumper of Mrs. Woltersdorf's truck.[2]

## A. Left Sternoclavicular Joint Injury

After taking her truck to be repaired, Mrs. Woltersdorf sought medical attention from her family physician Timothy Theobald, D.O.  The medical records indicate that on the day of the accident Dr. Theobald examined Mrs. Woltersdorf and he noted that she reported pain in her hip, shoulder and neck.  Joint Ex. 2, tab B at 3-4.  Dr. Theobald found her to have a cervical strain and that her left shoulder was benign, while the anterior chest wall was tender to touch.  *Id*. at 4.  Dr. Theobald's diagnosis was acute cervical strain, as well as sternal/left hip contusion.  *Id*.  He recommended a soft cervical collar for one week, with application of cold packs for 48 hours and then application of heat, as well as use of over-the-counter pain medication.  *Id*.

---

[1] At the time of the accident, Russell Desrochers was an employee of Phillips Express, Inc. and he acting within the scope of his employment with Defendant Phillips Express, Inc.

[2] The EMT note describes the damage to Mrs. Woltersdorf's bumper was "minor."  Joint Ex. 2, tab A.

Mrs. Woltersdorf and her husband, Kurt, live on over 200 acres, and maintain a 40' X 10' greenhouse in which they grow vegetables and flower seedlings. Trial Tr. of Kurt Woltersdorf at 8-9. Mr. and Mrs. Woltersdorf maintain their own business – Woltersdorf Acres, which employs Mr. Woltersdorf as an arborist and Mrs. Woltersdorf as a gardener and landscaper. Although she did some work in the days following the accident, Mrs. Woltersdorf returned for treatment on June 7, 1999. Dr. Theobald's note from that visit is as follows:

> S: Follow-up cervical strain. Patient has unfortunately continued to work due to financial constraints and this has exacerbated her symptoms especially in her mid thoracic back area. She also did not purchase the soft cervical collar, but she has taken the Flexeril with some improvement. She is very stiff along the spine, but has no new complaints.
>
> O: Stiff, but comfortable. Vital signs stable. No significant change in cervical or thoracic exam. A lot of muscle hypertonicity noted along the paravertebrals. Limited range of motion due to discomfort.
>
> A&P: 1. Cervical strain/generalized cervical thoracic somatic dysfunction – applied gentle OMT utilizing soft tissue and myofascial techniques. Gave Relafen 750 mg PO b.i.d., nine day supply, emphasize soft cervical collar. Will recheck in 1-2 weeks.

Joint Ex. 2, tab B at 6.

On June 14, 1999, almost two weeks after the accident, Mrs. Woltersdorf saw David Graves, a physician's assistant working in the office of Richard Beauchesne, M.D., who noted "seat belt burns" at the sternoclavicular joint region. Joint Ex. 2, tab C at 21. At that time, an x-ray indicated no gross fracture. *Id*. at 20. Mr. Graves ordered a CT scan of the sternum and left sternoclavicular joint, which was normal when reviewed during the return visit on June 16, 1999. *Id.* at 23. The CT scan of Mrs. Woltersdorf's

sternum and sternoclavicular joint indicated no abnormalities.  *Id*.  At that time she was diagnosed with a left sternoclavicular sprain and physical therapy was suggested.  *Id*.

Mrs. Woltersdorf began physical therapy on June 19, 1999.  Joint Ex. 2, tab E at 31-33.   In mid-July Mrs. Woltersdorf saw Mr. Graves for a follow-up and she indicated that everything was slowly getting better.  Joint Ex. 2, tab C at 24.  At that time, she was told to continue physical therapy as needed.  *Id*.  When Mrs. Woltersdorf returned to see Dr. Beauchesne on August 6, 1999, the note from that visit indicates that the physical therapy had actually worsened her symptoms, with her condition improving "significantly" since the therapy had been discontinued.  Joint Ex. 2, tab D at 26.  Dr. Beauchesne further states that "On today's visit, she is near normal and only has occasional aches in her neck.  She has a near full range of motion with no apparent difficulties."  *Id*.  At that time, Mrs. Woltersdorf was asking to return to "more aggressive work."  *Id*.  Dr. Beauchesne indicated he would see Mrs. Woltersdorf on an as needed basis and did not require a scheduled follow-up visit.  *Id*.

After undergoing chiropractic care, Mrs. Woltersdorf went back to Dr. Beauchesne in October 1999, complaining of irritation of the proximal portion of the left sternoclavicular joint.  *Id*. at 27.  The diagnosis given at that time was "sternoclavicular instability without frank dislocation."  *Id*.  She was given an injection in the sternoclavicular joint by Dr. Beauchesne and then referred to Donald Endrizzi M.D. for further evaluation.  *Id*. at 28.

Dr. Endrizzi examined Mrs. Woltersdorf in early November 1999 and ordered an MRI of her left shoulder.  Joint Ex. 2, tab I and tab J.  Dr. Endrizzi commented under the objective portion of his examination that "[a]ny attempt at ranging her shoulder actively

or passively was met with a rather significant amount of discomfort which appeared to be slightly out of proportion to the maneuvers performed." Joint Ex. 2, tab I at 51. He went on to state under his assessment that "Her examination today suggested severe pain out of proportion to the clinically observed abnormalities." *Id*. After reading the MRI and finding no abnormality at the sternoclavicular joint, Dr. Endrizzi concluded that "in the absence of any positive MRI finding or obvious physical exam finding other than her discomfort, I would elect no intervention." *Id*. at 62.

In December 1999, Mrs. Woltersdorf returned to Dr. Beauchesne, who referred her to Charles Blitzer M.D. an orthopedic and trauma specialist. Mrs. Woltersdorf then saw Dr. Blitzer on December 17, 1999. Joint Ex. 2, tab K at 63. One month later, on January 18, 2000, Dr. Blitzer indicated that he could provide no explanation or resolution for her pain, but referred her to Lyle Micheli, M.D. *Id*. at 65. At that time, Mrs. Woltersdorf started physical therapy again. Joint Ex. 2, tab M. Then on February 23, 2000, Mrs. Woltersdorf saw Dr. Micheli and he put her on an anti-inflammatory medication and shoulder strengthening exercises. Joint Ex. 2, tab O at 154. Although she was supposed to return to see Dr. Micheli in six weeks, Mrs. Woltersdorf did not return until six months later on August 28, 2000. *Id*. During that visit, Dr. Micheli's nurse practitioner discussed with Mrs. Woltersdorf "decreasing the amount of heavy load she is putting on this joint with her gardening." *Id.* at 155. When she returned to Dr. Micheli's office on November 20, 2000, Mrs. Woltersdorf reported to be getting better with the sternoclavicular joint seeming to have "settled down" with only occasional sharp pain. *Id*. at 156. At that visit, Dr. Micheli injected a steroid in the area of her sternoclavicular joint that had the maximum sensitivity. *Id*. Dr. Micheli continued to

5

treat her throughout 2000 and 2001 and she continued to have pain at the sternoclavicular joint. *Id*. at 157-58. In September 2001, Dr. Micheli advised her to consider resection surgery on her left sternoclavicular joint. *Id*. at 159. This surgery was scheduled after the end of Mrs. Woltersdorf's landscaping season and performed by Dr. Micheli on November 13, 2001. Joint Ex. 2, tab R at 247-98.

After the surgery, Mrs. Woltersdorf made positive progress and began physical therapy to increase strength and range of motion in her left arm. Joint Ex. 2, tab O at 167-69. She continued with regular physical therapy sessions through April 19, 2002. Joint Ex. 2, tab M at 74-94. Mrs. Woltersdorf's sternoclavicular joint pain was almost "nonexistent" after a few months following the sternoclavicular joint resection. Trial Tr. of Cathleen Woltersdorf at 53. In June 2002, Mrs. Woltersdorf had returned to work as a professional gardener and Dr. Micheli noted that she was doing "quite well" with "good strength and range of motion." Joint Ex. 2, tab O at 171.

**B. Left Shoulder Injuries**[3]

After a summer of landscaping work, Mrs. Woltersdorf was seen by Dr. Micheli on October 22, 2002, when she reported that she had experienced an episode two weeks earlier when she was shoveling and began having pain over the left shoulder superiorly and anteriorly. *Id*. at 172. Dr. Micheli found that she had evidence of shoulder impingement. The October 22, 2002 visit was the first time that he found any evidence of shoulder impingement in Mrs. Woltersdorf. Dr. Micheli Depo. at 58. Mrs.

---

[3] In this case, Mrs. Woltersdorf underwent three surgeries to her left shoulder. The sternoclavicular joint is part of the shoulder. Dr. Micheli Depo. at 8. However, for clarity in this opinion, the Court will refer to the acromioclavicular and the glenohumeral joints as the shoulder and refer to the sternoclavicular joint separately.

Woltersdorf started physical therapy again on October 31, 2002, and continued through July 2003. Joint Ex. 2, tab M at 98-137.

Mrs. Woltersdorf was seen again in Dr. Micheli's office on April 22, 2003, at the start of her landscaping season. The nurse practitioner's note from that visit states that she had asked Mrs. Woltersdorf to work around her discomfort and that "we feel she may have been overdoing it." Joint Ex. 2, tab O at 174. At that visit, Dr. Micheli treated Mrs. Woltersdorf's left shoulder with a steroid injection. *Id*. In September 2003 Dr. Micheli notes that Mrs. Woltersdorf has "all 3 [left shoulder] impingement signs today." *Id*. at 175. She continued to work as a gardener through October 2003. *Id*. In October 2003, with the results of a recent MRI of Mrs. Woltersdorf's left shoulder, Dr. Micheli confirms his diagnosis of shoulder impingement and significant acromioclavicular arthrosis. *Id*. at 176; Plaintiffs' Ex. 9. At that time, Dr. Micheli recommended surgery on the left shoulder to alleviate the impingement. Plaintiffs' Ex. 2, tab O at 176. Mrs. Woltersdorf underwent subacromial decompression surgery for the recently diagnosed impingement condition in her left shoulder on November 28, 2003. Joint Ex. 2, tab S at 299-353.

At trial, Defendants' orthopedic expert, Jonathon Sobel M.D., testified that Mrs. Woltersdorf's "[acromioclavicular] joint is really completely demolished. And this is a common finding of a very slowly progressive and arthritic joint." Trial Tr. of Dr. Sobel at 20. Using a shoulder model, Dr. Sobel explained that the MRI showed that the acromion of the shoulder had developed in arthrosis "in which the joint itself had largely dissolved and was forming large bone spurs. That process typically takes decades to occur and on that MRI it can be seen that there are under surface bone spurs which typically lead to impingement." *Id*. at 41-42. Dr. Sobel described how the new

impingement symptoms likely were related to Mrs. Woltersdorf's shoveling and other work activities and were not causally related to the June 2, 1999 accident.

Following this surgery, on January 5, 2004, Mrs. Woltersdorf began physical therapy with Gregory Thibeault. Joint Ex. 2, tab T at 354. Mr. Thibeault's note of February 6, 2004, indicates that Mrs. Woltersdorf was experiencing increased left shoulder soreness after cleaning water off the floor because of a frozen leech field. *Id*. at 367; Trial Tr. of Gregory Thibeault at 37. By mid-February Mrs. Woltersdorf then reported that, if she did anything extra, the pain would become severe for 15-20 minutes. Joint Ex. 2, tab T at 373. Mr. Thibeault confirmed in his testimony that he would not have wanted Mrs. Woltersdorf doing things that would cause her pain to increase significantly. Trial Tr. of Gregory Thibeault at 39. On March 16, 2004, Mr. Thibeault's note indicated that Mrs. Woltersdorf had a decrease in her shoulder pain in the past few days when she did not work. Joint Ex. 2, tab T at 379. In his testimony, Mr. Thibeault confirmed that Mrs. Woltersdorf appeared to be more comfortable when she took time off and did not perform the work that was causing stress to her left shoulder. Trial Tr. of Gregory Thibeault at 41.

Mrs. Woltersdorf continued to make progress and in the spring she began work as a landscaper and gardener. In April 2004, Dr. Micheli noted that she had "good stability and good range of motion" and he commented that overall "[h]er physical examination today is really quite re-assuring." Joint Ex. 2, tab M at 180. However, in August 2004 Mrs. Woltersdorf reported to Dr. Micheli that with certain maneuvers she "[felt] like it is slipping forward." *Id*. at 181. This is the first indication in her medical records that Mrs. Woltersdorf is experiencing left shoulder instability. Dr. Micheli Depo. at 64. Dr. Sobel

testified that it was the ongoing work stress that caused Mrs. Woltersdorf to have continuing left shoulder problems that required surgery, rather than the effects of the June 2, 1999 accident.  Trial Tr. of Dr. Sobel at 39-41.  In October 2004, Mrs. Woltersdorf's medical records indicate that she reported that the "episodes of subluxation have become worse now."  Joint Ex. 2, tab M at 183.  At that time, Dr. Micheli recommended a left shoulder stabilization surgery.  *Id*.  This surgery was performed on November 26, 2004.  *Id*. at 186-188.

After this surgery, Mrs. Woltersdorf again began a program of physical therapy with Mr. Thibeault.  *Id*. at 188-89.  His note from March 14, 2005 indicates that Mrs. Woltersdorf strained her left shoulder/scapula after using a roof rake to remove snow.  Joint Ex. 2, tab T at 439.  Mr. Thibeault confirmed that he had advised Mrs. Woltersdorf not to perform such an activity four months after her surgery.  Trial Tr. of Gregory Thibeault at 46.  After she resumed landscaping work in the spring of 2005, Mr. Thibeault's physical therapy notes document that Mrs. Woltersdorf was experiencing increased symptoms of discomfort and pain due to the work she performed.  *See* Joint Ex. 2, tab T at 447-451, 454, 457- 459.

## C. Changes in the Woltersdorfs' Lives After the Accident

In the first few months after the accident, Mrs. Woltersdorf suffered neck, hip, back and chest pain including at her sternoclavicular joint.  Trial Tr. of Cathleen Woltersdorf at 33-37.  While her neck, back and hip pain resolved, she went on to suffer persistent, and at times excruciating, pain in her sternoclavicular joint until she had surgery over two years later.  *Id*. at 37-48.  Mrs. Woltersdorf testified that she suffered from chronic pain for which she took daily medication, and which caused her to limit her

daily activities both in nature and duration.  *Id.* at 71-72.  This pain significantly impacted her personal and professional lives.  In an effort to make her sternoclavicular joint pain go away, Mrs. Woltersdorf endured physical therapy and several injections of steroids directly into and around her joint.  *Id*. at 42, 44-46.  Then she underwent the sternoclavicular joint resection surgery, the post-operation recovery for which was extremely painful.  *Id*. at 48, 50-51.

According to Mrs. Woltersdorf, her whole life has changed and it is necessary for her to make adaptation to almost every aspect of her working and personal life as a result of her sternoclavicular joint injury and shoulder injuries.  In addition, she and Mr. Woltersdorf are unable to engage in many of the leisure activities they enjoyed before the accident.  Mr. Woltersdorf testified that his wife's injuries, and the treatments necessary to care for her injuries, have created significant stress in their marriage.  Trial Tr. of Kurt Woltersdorf at 21.

## II. DISCUSSION

### A. Liability

In Maine, in order to establish a defendant's conduct was negligent a plaintiff must establish four elements: that a duty was owed, that the duty was breached, that the plaintiff suffered injury or damage, and that such injury or damage was proximately caused by the defendant's breach of duty.  *See, e.g., Mastriano v. Blyer*, 2001 ME 134, ¶ 11, 779 A.2d 951, 954.  In this case there is no dispute that Defendants breached an existing duty of care to Mrs. Woltersdorf and that Mrs. Woltersdorf has suffered an injury.  The issue litigated at trial was whether Defendants' breach proximately caused injuries to Mrs. Woltersdorf's left sternoclavicular joint and left shoulder.  Plaintiffs have

the burden of proving, by a preponderance of the evidence, that Defendants' negligence was the proximate cause of her harm. *Walter v. Wal-Mart Stores*, 2000 ME 63, ¶ 17, 748 A.2d 961, 968.  The Court finds that the injury to Mrs. Woltersdorf's sternoclavicular joint was proximately caused by the Defendants' negligence; however, she has failed to prove by a preponderance of evidence that her subsequent left shoulder problems were proximately caused by the accident.

### 1.  Sternoclavicular Joint Injury

Mrs. Woltersdorf testified, and the medical records confirm, that after the accident she suffered persistent pain in her left sternoclavicular joint and decreased strength in her left arm.  The pain would be greater at times than others.  Despite the pain, she continued to work in her landscaping business, albeit with reduced vigor.  After the accident, and continuing for a period of two and one half years, Mrs. Woltersdorf was treated by several doctors and a physical therapist in an effort to alleviate the pain she was experiencing.  Despite numerous medications, physical therapy, and steroid injections in the area of her sternoclavicular joint, Mrs. Woltersdorf's pain did not stop.  The Court finds that the injury to Mrs. Woltersdorf's left sternoclavicular joint was proximately caused by Defendants' negligence on June 2, 1999.

After a surgical resection of her left sternoclavicular joint, the pain and resulting physical limitations finally stopped.  After the surgery, Mrs. Woltersdorf made positive progress and began physical therapy to increase strength and range of motion in her left arm.  Joint Ex. 2, tab O at 167-69.  She continued with regular physical therapy sessions through April 19, 2002.  Joint Ex. 2, tab M at 74-94.  Mrs. Woltersdorf testified at trial that her sternoclavicular joint pain was almost "nonexistent" after a few months

following the sternoclavicular joint resection.  Trial Tr. of Cathleen Woltersdorf at 53.

The Court finds, therefore, that Mrs. Woltersdorf attained full recovery from the injury to

her sternoclavicular joint caused by the accident on April 19, 2002.  *Id*.  In June 2002,

Mrs. Woltersdorf is back to work as a professional gardener and Dr. Micheli notes that

she is doing "quite well" with "good strength and range of motion."  Joint Ex. 2, tab O at

171.

     Defendants argue that Mrs. Woltersdorf failed to mitigate her damages by not

properly resting her injury and returning to vigorous work too soon after the accident.[4]

Where the defendant "goes beyond relying on the plaintiff's burden to assert

affirmatively that plaintiff's damages were caused not by defendant's negligence, but by

some other causative factor, . . . the burden shifts to the defendant to prove by a

preponderance of the evidence that the other condition or factor caused plaintiff's

damages in whole or in part."  *See Merrill v. Sugarloaf Mountain Corp.*, 2000 ME 16,

¶ 12, 745 A.2d 378, 384 (citing *Lovely v. Allstate Insurance Co.*, 658 A.2d 1091, 1093-94

(Me. 1995) (Lipez, J., concurring)).

     To support their mitigation argument, Defendants rely on various entries in Mrs.

Woltersdorf's medical records.  Specifically, Dr. Theobald's notes from five days after

the accident provide "Patient has unfortunately continued to work due to financial

constraints and this has exacerbated her symptoms especially in her mid thoracic back

---

[4] At trial Defendants posed questions to a number of witnesses attempting to illicit evidence of a pre-existing condition of Mrs. Woltersdorf left sternoclavicular joint.  Nevertheless, there is no argument in Defendants' post-trial briefs regarding a pre-existing condition.  Even if Defendants did argue that Mrs. Woltersdorf had a pre-existing sternoclavicular condition, Defendants failed to establish that such pre-existing condition caused Mrs. Woltersdorf's pain in the area of her sternoclavicular joint.  *See* Trial Tr. of Cathleen Woltersdorf at 21; Trial Tr. of Dr. Bruhl  at 6-7 (indicating Mrs. Woltersdorf was treated by Dr. Bruhl in 1997 for "generalized chest pain."); Trial Tr. of Dr. Bruhl at 48-50 (By October 31, 1997, after seven to eight chiropractic treatments, Mrs. Woltersdorf's chest pain resolved and Dr. Bruhl never adjusted her sternoclavicular joint again.)

area.  She also did not purchase the soft cervical collar" as had been recommended.  Joint Ex. 2, tab B at 6.  Again in September 1999, Mrs. Woltersdorf reported an aggravation of symptoms after having used a pull saw for two hours.  Joint Ex. 2, tab H at 49.  Defendants also rely on the medical records from Mrs. Woltersdorf's August 28, 2000, visit with Dr. Micheli's nurse practitioner, where it is noted that she discussed with Mrs. Woltersdorf "decreasing the amount of heavy load she is putting on this joint with her gardening."  Joint Ex. 2, tab O at 155.  These medical records, Defendants suggest, provide confirmation of an ongoing pattern of "overdoing it" and failing to take reasonable steps to mitigate her damages.  If she had followed her doctor's advice shortly after the accident, Defendants argue, Mrs. Woltersdorf would have made a full recovery without the need for surgery.  Defendants' expert orthopedic surgeon, Jonathan Sobel, M.D., testified that in his opinion the aggressive work Mrs. Woltersdorf continued to perform perpetuated the sternoclavicular joint symptoms.  Based on his review of Mrs. Woltersdorf's medical records, Dr. Sobel concluded that if she had rested her injury, her sternoclavicular joint would have healed uneventfully.  Trial Tr. of Dr. Sobel at 114.

Although there is some indication in Mrs. Woltersdorf's medical records that she was, on occasion, using her injured left side more rigorously than she should have during her busy summer landscaping seasons following the accident, there is no evidence that she reinjured her sternoclavicular joint in the two and one half years after the accident.  Defendants have failed to produce sufficient evidence, establishing that Mrs. Woltersdorf suffered post-accident injury or any condition that, more likely than not, caused Mrs. Woltersdorf's claimed injuries and pain.  The Court is not persuaded by Dr. Sobel's opinion that if Mrs. Woltersdorf had rested her left side, the sternoclavicular joint would

have healed without the need for surgery.  Trial Tr. of Dr. Sobel at 114.  Moreover, the

record does not establish that Mrs. Woltersdorf failed to mitigate her damages either by

overusing her left side and exacerbating her sternoclavicular injury.

**2. Left Shoulder Problems**

After recovering from the sternoclavicular joint resection surgery in the spring of

2002, that fall Mrs. Woltersdorf began to experience pain in her left shoulder.  The pain

began following five months of spring and summer landscaping work and Mrs.

Woltersdorf was seen by Dr. Micheli on October 22, 2002.  At that time, she reported that

she had experienced an episode approximately two weeks earlier when she was shoveling

and began having pain over the left shoulder superiorly and anteriorly.  Joint Ex. 2, tab O,

at 172.  Dr. Micheli found that she had evidence of shoulder impingement.  *Id.*  Dr.

Micheli confirmed that the October 22, 2002 visit, some three years and four months after

the accident, was the first time that he found any evidence of shoulder impingement in

Mrs. Woltersdorf.  Micheli Depo. at 58.  Approximately one year later, in November

2003, Mrs. Woltersdorf underwent surgery for left shoulder impingement.  After

recovering from that surgery, Mrs. Woltersdorf began to experience instances of left

shoulder subluxation or slipping out of joint.  Joint Ex. 2, tab M at 183.  One year later, in

November 2004, Dr. Micheli performed left shoulder stabilization surgery.  *Id*. at 186-

188.

Plaintiffs contend that the left shoulder pain, and ultimate need for the left

shoulder impingement surgery and the left shoulder subluxation surgery, were caused by

the accident.  Plaintiffs rely on the testimony of Dr. Micheli to support their theory of

causation.  Dr. Micheli testified that in his opinion the two shoulder surgeries were

14

"probably related" to the injury to Mrs. Woltersdorf's sternoclavicular joint in the automobile accident.  Dr. Micheli Depo. at 15.  When asked to explain how they may be related, Dr. Micheli responded "If one has a shoulder condition of any kind including injuries at the [acromioclavicular] joint of some chronicity or glenohumeral joint of some chronicity and the shoulder is injured, it may trigger a sequence of events that result in progressive pain and impingement."  *Id.* at 16.  Implicit in Dr. Micheli's testimony is that there may have been other causes for Mrs. Woltersdorf's shoulder impingement and instability; yet he never identified those other causes.  Moreover, he failed to explain why he ruled out the other possible reasons for Mrs. Woltersdorf's left shoulder impingement and instability.

Although Dr. Micheli is a highly qualified orthopedic surgeon, his opinion testimony in this case is unsupported by any rationale.  This conclusory, speculative, and unexplained testimony does not provide as a basis for finding a causal connection between the accident and the left shoulder surgeries done on Mrs. Woltersdorf in 2003 and 2004.  There is no competent, objective medical evidence that establishes a causal connection between Mrs. Woltersdorf's left shoulder conditions, both of which arose after she fully recovered from the sternoclavicular surgery in 2002, and the automobile accident some four to five years earlier.   Courts routinely find causation lacking where experts offer only conclusory opinions, did not address whether other factors might have caused the plaintiff's injuries, and failed to state why or how they came to their conclusions.  *See, e.g., Valente v. Sofamor*, *S.N.C.*, 48 F. Supp. 2d. 862, 869-69 (E.D. Wis.1999) (no competent evidence of causation where plaintiff's expert gave conclusory opinions, failed to identify a defect in the design or manufacture of the device and failed

15

to perform differential diagnosis); *Coleman v. Danek Medical, Inc.*, 43 F. Supp. 2d 637, 650 (S.D. Miss.1999) (no causation where expert offered only conclusory assertions, failed to identify causal nexus between Danek's product and harm to plaintiff); *Driggers v. Sofamor*, *S.N.C.*, 44 F. Supp. 2d 760, 765 (M.D.N.C. 1998) (no competent evidence of causation where expert failed to rule out other causes of plaintiff's pain). Because Dr. Micheli has failed to provide any explanation as to how he reached his conclusions, the Court finds that Plaintiffs have failed to meet their burden of proof in establishing a causal connection between the automobile accident and Mrs. Woltersdorf's latter two left shoulder surgeries.[5]

### B. Damages

Based on the evidence presented at trial, the Court will allow Mrs. Woltersdorf to recover the following damages:

### 1. Medical Bills

Mrs. Woltersdorf has submitted medical bills totaling $97,290.46 covering services provided from June 2, 1999 through March 2006. Because the Court has determined that Defendants' liability is limited to the period from June 2, 1999 through April 19, 2002, the total recovery permissible is Twenty-Five Thousand Two Hundred Seventy Dollars and Sixty-Nine Cents ($25,270.69).[6]  *See* Joint Ex. 6.

---

[5] Furthermore, Dr. Sobel specifically rebutted in a credible manner Plaintiffs' contention that an injury and later surgery to the sternoclavicular joint could then set the stage for the development of shoulder impingement problems. Trial Tr. of Dr. Sobel at 38-41.

[6] The Court reached the figure for the allowable recovery for the medical bills by limiting the recovery to charges incurred before April 20, 2002. With respect to the charges for the chiropractic care by Timothy Bruhl, the charges for this treatment is lumped together, rather than providing a per visit cost. Because Mrs. Woltersdorf is permitted to recover for the treatment provided from Dr. Bruhl only until April 19, 2002, the Court has determined an average per visit cost in order to calculate the total recovery for Dr. Bruhl's services. In addition, with respect to the charges for the psychiatric social work services rendered by Dorothy Carlson and treatment by The Maine Center for TM Disorders there was no showing that the

**2. Medication**

Mrs. Woltersdorf has submitted medication costs totaling $1,773.67 covering prescription and over the counter medications purchased from June 2, 1999 through February 2006.  Because the Court has determined that Defendants' liability is limited to the period from June 2, 1999 through April 19, 2002, the total recovery permissible is Nine Hundred Seventy-Four Dollars and Seventy-Two Cents ($974.72).  *See* Plaintiffs' Ex. 48.

**3. Travel to and from Medical Appointments**

Mrs. Woltersdorf has submitted travel expenses to and from medical appointments at a rate of $0.375 per mile and totaling $6,302.94 from June 2, 1999 through May 2005.  Because the Court has determined that Defendants' liability is limited to the period from June 2, 1999 through April 19, 2002, the total recovery permissible is Two Thousand One Hundred Seventy-Nine Dollars and Thirty-Four Cents ($2,179.34).[7]  *See* Plaintiffs' Ex. 41.

**4. Damaged Plants and Bulbs**

Mrs. Woltersdorf has submitted expenses related to plants damaged in the accident, or bulbs that were unable to be planted after the accident.  The Court will permit Mrs. Woltersdorf to recover One Thousand Eight Hundred Eighteen Dollars and Twenty-One Cents ($1,818.21) for the damaged plants and bulbs that were unable to be used.  *See* Plaintiffs' Ex. 42.

---

treatments were necessary and related to Mrs. Woltersdorf's injuries caused by the accident.  Therefore, the Court will disallow the entire $8,985 charge for social work services and $633 charge from The Maine Center for TM Disorders.

[7] Defendants do not object to any specific aspect of the travel expenses.

**5. Lost Wages**

Mrs. Woltersdorf's Complaint includes a claim for her lost wages and loss of earning capacity.  This claim was the subject of a Motion in Limine to exclude evidence of supplemental lost income not disclosed during discovery and all evidence of Mrs. Woltersdorf's claim for future loss of earning capacity not disclosed in discovery. Magistrate Judge Cohen granted Defendants' Motion to Exclude, limiting the claim for lost earnings from the date of the accident until May 31, 2005, and finding that Plaintiffs timely disclosed only $9,955 in lost wages for that time period.  Memorandum on Defendants' Motion to Exclude (Docket Item No. 28).  Plaintiffs appealed the Magistrate Judge's decision and Judge Singal affirmed the ruling.  Endorsement (Docket Item No. 40).[8]  The Court finds that Mrs. Woltersdorf is entitled to recover Six Thousand Five Hundred Eighty-Five Dollars ($6,585) in lost income from June 2, 1999 through April 19, 2002.  *See* Joint Ex. 7.

**6. Pain and Suffering**

As to the physical harm suffered by Mrs. Woltersdorf from the accident, there can be no question that she has endured persistent, and often substantial, pain over a period of almost three years after the accident.  Trial Tr. of Cathleen Woltersdorf at 33, 37, 48, 50-51, 53-54, 59-63, 66.  In the months following the accident, Mrs. Woltersdorf suffered neck, hip, back and chest pain including that at her sternoclavicular joint.  *Id*. at 33-37. While her neck, back and hip pain thereafter resolved, she went on to suffer persistent and at times excruciating pain until the time of her sternoclavicular joint surgery two

---

[8] Although Magistrate Judge Cohen left open for trial the issue of whether Mrs. Woltersdorf may seek an additional amount representing lost earnings and lost earning capacity after May 31, 2005, it is not necessary for the Court to reach that issue since there was insufficient evidence to connect Mrs. Woltersdorf's shoulder problems after April 19, 2002, to the accident.

years later.  *Id*. at 37-48.  Mrs. Woltersdorf testified that she suffered from chronic pain

for which she took daily medication, and which caused her to limit her daily activities

both in nature and duration.  *Id*. at 71-72.  This pain significantly impacted her personal

and professional lives.  In an effort to make her sternoclavicular joint pain go away, Mrs.

Woltersdorf endured physical therapy and several injections of steroids directly into and

around her joint.  *Id*. at 42, 44-46.  Then she underwent the sternoclavicular joint

resection surgery, the post-operation recovery for which was extremely painful.  *Id*. at 48,

50-51.  After the initial three weeks of post-operative recovery, Mrs. Woltersdorf

suffered what she described as "grueling" physical therapy sessions three times a week.

   The Court finds that Mrs. Woltersdorf is entitled to recover Eighty-Three

Thousand Dollars ($83,000) for the pain and suffering she endured from June 2, 1999

through April 19, 2002.[9]

**7. Loss of Consortium**

   At the time this case was tried, Kurt Woltersdorf had been married to Cathleen

Woltersdorf for seventeen years.  "For centuries courts have recognized a [spouse's] right

to recover damages for the loss of consortium when a tortious injury to [the other spouse]

detrimentally affects the spousal relationship."  *Gayer v. Bath Iron Works Corp*., 687

A.2d 617, 622 (Me. 1996) (quoting *Macomber v. Dillman*, 505 A.2d 810, 813

(Me.1986)).  Mr. Woltersdorf seeks compensation for the loss of her society and

---

[9] Mrs. Woltersdorf also argues that "under prevailing Maine law, even if her injuries, limitations, pain, treatment and surgeries after the June 2, 1999 were not, in fact, causally related thereto . . . [she] is entitled to recover for the mental pain and suffering she has endured from *her reasonable belief* that all of her harm directly resulted from the Defendants' negligence."  Plaintiffs' Post Trial Brief at 34 (citing *Bolton v. Caine*, 584 A.2d 615, 618 (Me. 1990) and *Benson v. United States*, 265 F. Supp. 2d 98 (D. Me. 2003)).  Even if this type of damage is properly recoverable, a proposition as to which the Court is dubitant, there is no evidence that Mrs. Woltersdorf suffered any additional mental anguish as a result of her belief that her injuries were caused by the accident.

companionship for the period of time his wife was injured and recovering from surgery. In addition to the loss of his wife's comfort and society, Mr. Woltersdorf claims that he deserves compensation for the diminished enjoyment, and increased stress, that her injuries had on their business enterprise.  Finally, Mr. Woltersdorf seeks compensation for his loss of income in caring for his wife.  *See* Joint Ex. 7.

Mr. Woltersdorf testified that before the accident they were a team, with obligations equally divided, and after the accident "one half the field is taking a little more responsibility than they did before."  Trial Tr. of Kurt Woltersdorf at 21.  Mr. Woltersdorf described his wife's recuperation from her multiple shoulder surgeries as follows:

> The worse part is that it would go on for weeks.  I would work a full day. She always had the surgery in the winter to recuperate in time to get started in April.  I would put in a full day of work.  I have a very physical job, cold conditions, maybe with snow.  When I got home it was like starting a second job, I had to fix dinner, do dishes, maybe laundry, get Cathleen showered, change her dressing, put her slings on and an ice cup, which is a sling with ice water, food shopping.  I did everything for weeks afterwards, it was my responsibility.  It was like working two jobs. Finally at about 8:30, 9:00 o'clock I could sit down and at that point it was time to go to bed.  I did not have anything to look forward to for the next day.

*Id.* at 17.  Mr. Woltersdorf described the change in the marital relationship brought about by this accident as follows: "I think the best way to sum it up is our marriage might survive but not at all in the same form that it did before."  *Id*. at 22.

Mr. Woltersdorf has established his entitlement to damages to compensate him for the loss of those parts of his marital relationship, including love, comfort, and companionship he was deprived of as a result of his wife's injury in the June 2, 1999, accident.  Mr. Woltersdorf cannot recover for the diminished enjoyment and increased

stress on their business enterprise or his loss of income.  *See Poirier v. United States*, 745

F. Supp. 23, 31 (D. Me. 1990) ("consortium. . .  represents reciprocal rights inherent in

the marital relationship . . . It embraces love, companionship, affection, society, sexual

relations, services, solace")(citations omitted); *Sawyer v. Bailey*, 413 A.2d 165, 167 (Me.

1980)(loss of consortium is the loss of "marital rights").  The Court finds the Kurt

Woltersdorf is entitled to recover Twenty Thousand Dollars ($20,000) for the loss of his

wife's comfort and society from June 2, 1999 through April 19, 2002.

### Summary of Damages

| | |
|---|---:|
| 1. Medical Bills | 25,270.69 |
| 2. Medications | 974.72 |
| 3. Travel to and from Medical Appointments | 2,179.34 |
| 4. Damaged Plants and Bulbs | 1,818.21 |
| 5. Lost Wages | 6,585.00 |
| 6. Pain and Suffering | 83,000.00 |
| **Total Recovery for Mrs. Woltersdorf** | **$119,827.96** |
| 7. Loss of Consortium | 20,000.00 |
| **Total Recovery for Mr. Woltersdorf** | **$ 20,000.00** |

### II. CONCLUSION

Accordingly, the Court **ORDERS** that judgment be entered for Cathleen

Woltersdorf on her negligence claim in the amount of One Hundred Nineteen Thousand

Eight Hundred Twenty-Seven Dollars and Ninety-Six Cents ($119,827.96) and that

judgment be entered for Kurt Woltersdorf on his loss of consortium claim in the amount

of Twenty Thousand Dollars ($20,000).

/s/ Gene Carter
GENE CARTER
Senior United States District Judge

Dated this 6th day of July, 2006.